15-2181-cv(L)

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2016

Nos. 15-2181-cv(L), 15-2283-cv(Con), 15-2285-cv(Con),
15-2487-cv(Con), 15-2506-cv(Con), 15-2687-cv(Con)

IN RE: WORLD TRADE CENTER
LOWER MANHATTAN DISASTER SITE LITIGATION

---

STANISLAW FALTYNOWICZ, LUCYNA FOREMSKA, RUBEN ACOSTA,
VLADMIR AKOULOV, WALDEMAR BALCER, JOAQUIN CAMPUZANO,
HENRYK CIBOROWSKI, JAN DOBROWOLSKI, MAREK GLOWATY,
EUGENIUSZ JASTRZEBOWSKI, ZBIGNIEW KUCHARSKI, MARIA MORENO,
IRENA PERZYNASKA, MARIAN RETELSKI, DARIUSZ WSZOLKOWSKI,
BOGUSLAW ZALEWSKI,
*Plaintiffs-Appellants*,

STATE OF NEW YORK,
*Intervenor-Appellant*,

*v.*

BATTERY PARK CITY AUTHORITY, ET AL.,
*Defendants-Appellees.*

---

SANTIAGO ALVEAR,
*Plaintiff-Appellant,*

STATE OF NEW YORK,
*Intervenor-Appellant,*

*v.*

BATTERY PARK CITY AUTHORITY,
*Defendant-Appellee.*

---

PETER CURLEY, MARY ANN CURLEY,
*Plaintiffs-Appellants,*

STATE OF NEW YORK,
*Intervenor-Appellant,*

*v.*

BATTERY PARK CITY AUTHORITY,
*Defendant-Appellee.*[*]

---

Appeal from the United States District Court
for the Southern District of New York.
No. 21 MC 102 — Alvin K. Hellerstein, *Judge.*

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

ARGUED: OCTOBER 5, 2016
DECIDED: JANUARY 19, 2017

Before: LYNCH, DRONEY, *Circuit Judges*,
and REISS, *Chief District Judge*.[*]

Appeal from orders of the United States District Court for the Southern District of New York (Hellerstein, *J.*) granting summary judgment in favor of Battery Park City Authority ("BPCA"). The district court held that BPCA, a public benefit corporation, had the capacity to raise a due process challenge under the New York State Constitution to a New York State statute that revived claims against public corporations for personal injuries sustained during the rescue, recovery, and cleanup efforts that followed the terrorist attacks of September 11, 2001. The court further held that the statute violated BPCA's due process rights under the state constitution. This appeal followed. Because we conclude that there is insufficient New York State authority on the legal standards governing these issues, we **CERTIFY** two questions to the New York Court of Appeals.

GREGORY J. CANNATA, Gregory J. Cannata & Associates, LLP, New York, New York, *for Plaintiffs-Appellants Stanislaw Faltynowicz, Lucyna Foremska, Ruben Acosta,*

[*] Chief Judge Christina Reiss, United States District Court for the District of Vermont, sitting by designation.

*Vladmir Akoulov, Waldemar Balcer, Joaquin Campuzano, Henryk Ciborowski, Jan Dobrowolski, Marek Glowaty, Eugeniusz Jastrzebowski, Zbigniew Kucharski, Maria Moreno, Irena Perzynaska, Marian Retelski, Dariusz Wszolkowski, Boguslaw Zalewski.*

PAUL J. NAPOLI (Michael Cohan, *on the brief*), Worby Groner Edelman & Napoli Bern, LLP, New York, New York, *for Plaintiffs-Appellants Santiago Alvear, Peter Curley, Mary Ann Curley.*

ANDREW W. AMEND, Senior Assistant Solicitor General (Barbara D. Underwood, Steven C. Wu, Eric Del Pozo, *on the brief*), *for* Eric T. Schneiderman, Attorney General for the State of New York, New York, New York, *for Intervenor-Appellant State of New York.*

JOHN M. FLANNERY (Eliza M. Scheibel, *on the brief*), Wilson Elser Moskowitz Edelman & Dicker LLP, White Plains, New York, *for Defendant-Appellee Battery Park City Authority.*

4

DRONEY, *Circuit Judge*:

This appeal requires us to determine whether Battery Park City Authority ("BPCA"), a public benefit corporation, has the capacity to challenge a New York State claim-revival statute as unconstitutional under the New York State Constitution, and whether that challenge succeeds on the merits. As we explain below, we believe we cannot resolve those questions without first certifying two predicate questions to the New York Court of Appeals:

(1) Before New York State's capacity-to-sue doctrine may be applied to determine whether a State-created public benefit corporation has the capacity to challenge a State statute, must it first be determined whether the public benefit corporation "should be treated like the State," *see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 192 (N.Y. 1987), based on a "particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it," *see John Grace & Co. v. State Univ. Constr. Fund*, 375 N.E.2d 377, 379 (N.Y. 1978), and if so, what considerations are relevant to that inquiry?; and

(2) Does the "serious injustice" standard articulated in *Gallewski v. H. Hentz & Co.*, 93 N.E.2d 620 (N.Y.

5

1950), or the less stringent "reasonableness" standard articulated in *Robinson v. Robins Dry Dock & Repair Co.*, 144 N.E. 579 (N.Y. 1924), govern the merits of a due process challenge under the New York State Constitution to a claim-revival statute?

Accordingly, we **CERTIFY** these questions to the New York Court of Appeals.

**BACKGROUND**

**I.    Battery Park City Authority**

In 1968, the New York State Legislature decided to address the "substandard, insanitary, deteriorated and deteriorating conditions" affecting Manhattan's Lower West Side. N.Y. Pub. Auth. Law § 1971. Accordingly, it created BPCA and tasked it with "replanning, reconstructi[ng] and rehabilitati[ng]" the area, with significant participation by the private sector, "for the prosperity and welfare of the people of the city of New York and of the state as a whole." *Id.* The redevelopment was to include the creation of a mixed commercial and residential community. *See id.*

6

To accomplish this goal, BPCA was created as a public benefit corporation,[1] *id.* § 1973, and authorized to, *inter alia*, "sue and be sued," "acquire, lease, hold, mortgage and dispose of real property," "fix, establish and collect rates, rentals, fees and other charges," and "borrow money and issue negotiable bonds, notes or other obligations," *id.* § 1974. BPCA maintains its own general fund, *see id.* § 1975, and is solely responsible for the repayment of its bond obligations, *see id.* § 1979. It has seven members, each appointed by the Governor with the advice and consent of the New York Senate. *Id.* § 1973(1).

BPCA has successfully developed the 92-acre site—known as Battery Park City—into a community that houses over 10 million square feet of commercial space, 13,500 residents, 4 public schools, and 36 acres of parks. *See Who We Are*, BATTERY PARK CITY

---

[1] New York law defines a "public benefit corporation" as a "corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof." N.Y. Gen. Constr. Law § 66(4).

7

AUTHORITY, http://bpca.ny.gov/about/who-we-are/ (last visited Jan. 13, 2017).

**II.    Plaintiffs' Claims Against BPCA**

This consolidated appeal involves claims for personal injuries sustained by eighteen workers who participated in the large-scale cleanup operations across Lower Manhattan following the terrorist attacks of September 11, 2001. In the years that followed, these Plaintiffs developed a host of serious respiratory illnesses. Plaintiffs believe their illnesses stemmed from the cleanup work they had performed at several BPCA-owned properties impacted by the 9/11 attacks. Specifically, Plaintiffs believe they had been exposed to harmful toxins as a result of BPCA's failure to adequately ensure worker safety at those sites. Consequently, between 2006 and 2009, Plaintiffs filed personal injury suits against BPCA in the United States District Court for the Southern District of New York, asserting

8

claims under New York labor law and common-law negligence.[2]

Plaintiffs' suits, along with hundreds of others, were assigned to Judge Hellerstein and consolidated for pretrial purposes.

In July 2009, the district court dismissed a substantial number of these cases, including Plaintiffs', for failure to serve a timely notice of claim upon certain public defendants as required by New York law.[3] Specifically, the district court dismissed more than 600 suits against BPCA, and another 124 suits against other public and municipal entities.

---

[2] Plaintiffs filed suit in the Southern District of New York pursuant to the Air Transportation Safety and System Stabilization Act, which vested that court with "exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001." Pub. L. No. 107-42, § 408(b)(3), 115 Stat. 230 (codified at 49 U.S.C. § 40101 note). Unless inconsistent with or preempted by federal law, New York law governs Plaintiffs' claims. *See id.* § 408(b)(2).

[3] Under New York law, a plaintiff filing a personal injury claim against a public defendant must: (1) serve a notice of claim within ninety days of the claim's accrual, N.Y. Gen. Mun. Law § 50-e(1)(a); and (2) file suit within three years of the claim's accrual, N.Y. C.P.L.R. 214(5). A claim based on a latent injury from exposure to a harmful substance accrues "on the date of discovery of the injury by the plaintiff or on the date when through the exercise of reasonable diligence the injury should have been discovered, whichever is earlier." N.Y. C.P.L.R. 214-c(3).

### III.  Jimmy Nolan's Law

In the wake of these dismissals, the New York Legislature enacted General Municipal Law § 50-i(4), known as "Jimmy Nolan's Law," which revived for one year all time-barred claims against public corporations for personal injuries sustained by workers who participated in post-9/11 rescue, recovery, or cleanup efforts. *See* N.Y. Gen. Mun. Law § 50-i(4)(a). The Legislature explained that "thousands of World Trade Center workers ha[d] developed disabling respiratory illnesses and other injuries at rates that greatly exceed those of the general population," and that those workers "should not be denied their rights to seek just compensation simply because they were provided incorrect information about their work conditions, did not immediately recognize the casual connection between their injuries and their exposure, or were unaware of the applicable time limitations." N.Y. State Assembly Mem. Supp. Legislation, *reprinted in* Bill Jacket for 2009 A.B. 7122, Ch. 440, at 6

10

(July 17, 2009). Following the law's enactment, many workers, including Plaintiffs, revived their claims against BPCA.

**IV.    BPCA's Challenge to Jimmy Nolan's Law**

In August 2014, BPCA moved for summary judgment against eight workers who had filed suit against BPCA pursuant to Jimmy Nolan's Law, challenging the law as unconstitutional. BPCA contended, first, that it had the capacity to raise such a challenge despite its status as a public benefit corporation, and, second, that the law violated its due process rights under the New York State Constitution. The Attorney General of the State of New York (hereinafter the "Attorney General") intervened to defend the law.

The district court (Hellerstein, *J.*) agreed with BPCA, and granted summary judgment in BPCA's favor. *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 66 F. Supp. 3d 466, 468 (S.D.N.Y. 2014). In so ruling, the district court held that BPCA is an entity independent of New York State and therefore has the capacity to

11

challenge the constitutionality of State statutes. *Id.* at 473. On the merits, the court held that "Jimmy Nolan's Law does not fall within the narrow exception for revival statutes" under New York law, and is "unconstitutional under the Due Process Clause of the New York State Constitution, as applied to BPCA." *Id.* at 476.

On March 5, 2015, BPCA moved to extend the district court's ruling to an additional 171 workers, including Plaintiffs. Finding no relevant factual differences between those workers and the eight whose claims were previously dismissed, the district court granted BPCA's motion. *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, No. 21 MC 102 (S.D.N.Y. Apr. 13, 2015), ECF No. 5796. Plaintiffs and the Attorney General now appeal.

## DISCUSSION

### I. Standard of Review

We review *de novo* a district court's grant of summary judgment. *Matthews v. City of New York*, 779 F.3d 167, 171 (2d Cir.

2015). Summary judgment is proper only if "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). We also review *de novo* a district court's interpretation and application of state law. *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 199 (2d Cir. 2003) (per curiam).

## II.  BPCA's Capacity to Challenge Jimmy Nolan's Law

### a.  The Capacity-to-Sue Rule

New York follows the traditional capacity-to-sue rule, which states that "municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." *City of New York v. State of New York*, 655 N.E.2d 649, 651 (N.Y. 1995). Such entities are "purely creatures or agents of the State," and so "cannot have the right to contest the actions of their principal or creator affecting them in their governmental capacity." *Id.* In other words, "political

13

power conferred by the Legislature confers no vested right as against the government itself." *Id.* (quoting *Black River Regulating Dist. v. Adirondack League Club*, 121 N.E.2d 428, 433 (N.Y. 1954)). This rule is also a "necessary outgrowth of separation of powers doctrine: it expresses the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions." *Id.* at 654.

The New York Court of Appeals has recognized four exceptions to this general rule: (1) where a public corporation has express statutory authorization to bring suit; (2) where the legislation adversely affects a public corporation's proprietary interest in a specific fund of moneys; (3) where the statute impinges upon "Home Rule" powers of a public corporation constitutionally guaranteed under article IX of the New York State Constitution; and (4) where the public corporation asserts that, if it is obliged to

14

comply with the statute, that very compliance will force the corporation to violate a constitutional proscription. *See id*. at 652.

Resolution of the issue of whether BPCA may mount its constitutional challenge would thus seemingly involve the straightforward application of the capacity-to-sue rule and its four recognized exceptions. However, BPCA asserts that, before this rule may be applied, two criteria must first be met: (1) it must be determined that the public entity "should be treated like the State," as determined by a "particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it;" and (2) the statute must restrict the public benefit corporation's governmental powers. We address each criterion in turn.

### b.  The "Particularized Inquiry" Test

In *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, the New York Court of Appeals recognized that public benefit corporations are not political subdivisions of the State "but rather enjoy, for some

15

purposes, an existence separate and apart from the State." 516 N.E.2d 190, 192 (N.Y. 1987). The Court explained that a "particularized inquiry" is therefore "necessary to determine whether—for the specific purpose at issue—the public benefit corporation should be treated like the State." *Id.*

Consistent with this framework, the New York Court of Appeals has considered whether a public benefit corporation should be "treated like the State" for purposes of, *inter alia*, receiving immunity from punitive damages, *Id.* at 192–93, falling within the scope of a statute prohibiting the defrauding of the "state or any political subdivision thereof," *People v. Miller*, 519 N.E.2d 297, 298–99 (N.Y. 1987) (internal quotation marks omitted), and providing economic relief on public construction contracts, *John Grace & Co. v. State Univ. Constr. Fund*, 375 N.E.2d 377, 377–79 (N.Y. 1978).

It is unclear whether New York courts have applied the particularized-inquiry test in the present context—that is, to

determine whether a public benefit corporation should be treated like the State for the purpose of having the capacity to raise a constitutional challenge to a State statute. Nonetheless, BPCA urges us to apply the particularized-inquiry test here. Were we to do so, BPCA maintains, we would conclude that BPCA should not be treated like the State and is therefore not subject to the bar imposed by the capacity-to-sue rule.[4] Indeed, the district court concluded as much in its opinion below. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 66 F. Supp. 3d at 471–73.

In response, the Attorney General argues that, although public benefit corporations may not be identical to the State in every respect, they are indistinguishable from the State for the purpose of challenging a State statute. In other words, the Attorney General

---

[4] We pause here to note one of the ironies of this case. On the one hand, BPCA insists that it should not be treated like the State, and therefore may freely challenge Jimmy Nolan's Law as unconstitutional. On the other hand, BPCA has consistently invoked as a defense New York's 90-day notice-of-claim rule—a protection available to BPCA by virtue of its status as a public corporation. *See* N.Y. Gen. Mun. Law § 50-e.

17

contends that the capacity-to-sue rule is absolute, and does not turn on a particularized inquiry into the particular functions or purposes of the public corporation in question. Rather, the "relevant and dispositive factor" is whether the entity "remain[s] subject to the Legislature's ongoing control." Intervenor's Reply Br. at 4.

The Attorney General asserts that these principles are plainly illustrated by the New York Court of Appeals' decision in *Black River Regulating District v. Adirondack League Club*. In that case, the Black River Regulating District proposed a plan to build a reservoir and dam on the Moose River to regulate river flow, and raised funds for the project by issuing certificates of indebtedness. *Black River*, 121 N.E.2d at 430, 434. The Legislature later passed a statute effectively barring the project. *Id.* at 430. The District brought suit, challenging the statute as unconstitutional. *Id.* at 431. The Court of Appeals held that the District lacked the power to raise such a challenge. *Id.* at 434.

The Court explained:

> A regulating district charged with authority to carry out the public purpose is an agency of the State depending for its existence and performing its functions subject to the control and direction of the State. The number and nature of its powers are within the State's absolute discretion and any alteration, impairment or destruction of those powers by the Legislature presents no question of constitutionality.

*Id.* at 432–33. The Court further reasoned that the District had "no special character different from that of the State," that its purpose was "a State purpose," and that its "issuance of certificates of indebtedness [did] not confer upon [it] an independent status by which [it has] standing." *Id.* at 434. Accordingly, the District's suit was barred. *See id.*

Although the Attorney General argues that *Black River* precludes BPCA's challenge, we believe that the decision's significance is not so clear. As an initial matter, it is not evident whether, at the time of the Court's decision, the District was a "public benefit corporation" under New York law. The District's

19

enabling laws created "river regulating districts" as "public corporations," and defined that term as including "counties, towns, cities, villages, corporations created under this article and all other governmental agencies clothed with the power of levying general taxes." N.Y. Envtl. Conserv. Law §§ 430(7), 431 (1915). The law in effect in 1954, meanwhile, defined "public corporations" as including municipal corporations, district corporations, and public benefit corporations, each of which were defined separately. L.1941, ch. 460, § 3(1) (1941). Thus, we cannot discern whether the District was, at the relevant point in time, a public benefit corporation—as opposed to a municipal or district corporation—a fact that potentially undermines *Black River*'s significance to the present appeal.[5]

---

[5] Indeed, the current enabling statute for river regulating districts again employs the general term "public corporation," and provides that, for purposes of federal law, such districts are deemed to be municipal corporations. *See* N.Y. Envtl. Conserv. Law §§ 15-2103(1), 15-2103(1-a). *But see Hudson River-Black River Regulating District*, NEW YORK STATE, http://www.hrbrrd.com (last visited Jan. 13, 2017) (District, in its current incarnation, describing itself as a public benefit corporation); *N. Elec. Power Co. v. Hudson River-Black River Regulating Dist.*, 997

Even assuming the District was a public benefit corporation at the time of the Court's decision, it is not clear to us that *Black River* altogether forecloses application of the particularized-inquiry test. As described above, the Court observed that the District had "no special character" apart from that of the State, that its sole purpose was a "State purpose," and that its financial authority conferred no independent standing. *Black River*, 121 N.E.2d at 434. This language is not inconsistent with the particularized-inquiry test.

Our reading of *Black River* is further complicated by a later decision by the New York Court of Appeals in *Patterson v. Carey*. In that case, the Jones Beach State Parkway Authority, a public benefit corporation, financed a new parkway through the sale of bonds, and charged tolls on the parkway to discharge its bond obligations. *Patterson*, 363 N.E.2d 1146, 1149–50 (N.Y. 1977). Years later, the Parkway Authority announced a toll increase. *Id.* at 1150. The New

N.Y.S.2d 793, 794 (N.Y. App. Div. 2014) (characterizing District, in its current incarnation, as a public benefit corporation).

21

York Legislature quickly enacted a statute suspending the increase. *Id.* at 1150–51. The Parkway Authority and the institutional trustee for the Authority's bondholders filed suit against the State to declare the law unconstitutional. *Id.* at 1151. After concluding that the Parkway Authority and trustee had "sufficient standing" to bring suit, *id.* at 1151 n.*, the Court of Appeals found the statute unconstitutional, *id.* at 1151.

BPCA interprets *Patterson* as holding that a "public benefit corporation has standing to bring a constitutional challenge to a state statute." Appellee's Br. at 17. It is not clear, though, that *Patterson* should be interpreted in this way for several reasons. First, the Court of Appeals' discussion on standing is relegated to a footnote; the main text of the opinion concerns the merits of the plaintiffs' constitutional challenge and makes no mention of standing principles or the capacity-to-sue rule.[6]

---

[6] Indeed, the Court of Appeals has drawn a distinction elsewhere between "standing" and "capacity to sue," stating that "[t]he issue of lack of capacity to

Second, both the Parkway Authority and the institutional trustee for the bondholders served as plaintiffs. Accordingly, the Court had no need to consider whether the Parkway Authority, on its own, would have had the legal capacity to raise its challenge against the State. Indeed, in concluding that the plaintiffs had standing, the Court cited *Jeter v. Ellenville Central School District*, 360 N.E.2d 1086 (N.Y. 1977), apparently for the premise that, although a public entity might have "procedural standing" to participate in a suit challenging State legislation, it nevertheless lacks the substantive right to raise its own constitutional challenges. *See Jeter*, 360 N.E.2d at 1088. This view is supported by the Court's merits discussion, which focuses on the constitutional rights of the bondholders, not the Park Authority. *See Patterson*, 363 N.E.2d at

sue does not go to the jurisdiction of the court, as is the case when the plaintiffs lack standing." *City of New York*, 655 N.E.2d at 652. Thus, it is possible to read *Patterson* as ruling not on capacity to sue, the lack of which "is a ground for dismissal which must be raised by motion and is otherwise waived," *id.*, but rather on jurisdictional standing, thus making the case of little relevance to the present appeal.

23

1152 (holding that "the statute is arbitrary and deprives *bondholders* of a contractual right without due process of law" (emphasis added)).

Finally, although the Court's merits discussion reiterates the principle that a "public authority enjoys an existence separate and apart from the State, even though it exercises a governmental function," *id.* at 1154 (internal quotation marks omitted), that language speaks to whether the Legislature impermissibly infringed the State Comptroller's exercise of his discretionary power, and is separate from the Court's due process analysis, *see id.* Based on these considerations, we are disinclined to read *Patterson* as BPCA does. Nonetheless, *Patterson* adds additional uncertainty to an already unsettled area of state law.

In light of the foregoing, we believe there is an absence of definitive guidance on the question of whether the particularized-inquiry test applies in the present context. To our knowledge, no

New York court has squarely addressed this question and, as discussed above, other relevant State-law decisions are inconclusive. As a result, we are unable to predict with confidence how the New York Court of Appeals would resolve this issue—a factor weighing in favor of certification. *See Griffin v. Sirva Inc.*, 835 F.3d 283, 293–94 (2d Cir. 2016).

Moreover, it is less than clear to us from the caselaw how the particularized inquiry, if required, is to be conducted. We understand that such an inquiry focuses on "the nature of the instrumentality" in conjunction with "the statute claimed to be applicable to it." *John Grace*, 375 N.E.2d at 379. However, given the diversity of the types of public benefit corporations and of the issues at stake in the various cases in which such inquiries have been conducted, we find it difficult to discern not only whether New York law requires us to conduct a particularized inquiry, but also what such an inquiry would involve in the particular case before us.

### c. Restriction on Governmental Powers

BPCA also asserts that, for the capacity-to-sue rule to apply, the statute at issue must restrict the public entity's governmental powers. Here, BPCA contends, Jimmy Nolan's Law imposes no restrictions on BPCA's delegated powers and functions; rather, the law merely addresses procedural prerequisites to litigation against all public corporations. Accordingly, BPCA contends it is free to challenge the law's constitutionality.

This argument is squarely foreclosed by the New York Court of Appeals' decision in *City of New York v. State of New York*:

> [T]he municipal plaintiffs argue that the lack of capacity to sue doctrine only applies to . . . statutory restrictions on a municipality's power . . . . This contention ignores our precedents in which lack of capacity to sue has applied to block challenges to a far wider variety of State actions having differing adverse impacts on local governmental bodies and their constituents.

655 N.E.2d at 653. We therefore reject BPCA's argument as meritless.

26

**III.    The Constitutionality of Jimmy Nolan's Law**

On the merits, BPCA argues that Jimmy Nolan's Law violates its due process rights under the New York State Constitution.[7] The Attorney General asserts that the statute is constitutional. Before we can resolve this issue, we must first determine which legal standard applies when evaluating the constitutionality of a revival statute.

In *Robinson v. Robins Dry Dock & Repair Co.*, the New York Court of Appeals examined the constitutionality of a statute that revived for one year certain injured workers' claims. *See* 144 N.E. 579, 580 (N.Y. 1924). The Court began by recognizing that the situation was "accidentally produced"—the workers faced a limitations bar because they had originally pursued claims under an alternative statutory scheme, which was later overturned by the U.S. Supreme Court. *See id.* at 580, 582. Observing that disallowance of

---

[7] The revival of time-barred claims does not implicate federal due process protections. *See, e.g., Stogner v. California*, 539 U.S. 607, 651, 653 (2003); *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945). Presumably for that reason, BPCA raises no federal constitutional claim, and argues only that Jimmy Nolan's law conflicts with the New York State Constitution.

the workers' claims would thus "deprive a plaintiff without fault of a cause of action based on defendants' wrong," and noting that the revival statute imposed "no arbitrary deprivation" of the defendants' rights, the Court concluded that the statute was a "reasonable" exercise of the Legislature's power and declared the statute constitutional. *Id.* at 582.

In *Gallewski v. H. Hentz & Co.*, the Court of Appeals considered the constitutionality of a revival statute that provided redress to persons unable to file claims by virtue of being residents of Nazi-occupied territories during World War II. *See Gallewski*, 93 N.E.2d 620, 622 (N.Y. 1950). The Court of Appeals cited *Robinson*, and interpreted it as "holding that the Legislature may constitutionally revive a personal cause of action where the circumstances are exceptional and are such as to satisfy the court that serious injustice would result to plaintiffs not guilty of any fault if the intention of the Legislature were not effectuated." *Id.* at 624. Applying that test, the

Court held that the statute at issue was "entirely proper." *Id.* As the Court explained, World War II caused an "upheaval of unparalleled magnitude" and a "thorough disruption of communication," utterly preventing residents of occupied territories from filing claims in U.S. courts. *Id.* at 624–25. Allowing limitations periods to run during such a time, the Court concluded, "would not accord with elementary notions of justice and fairness." *Id.* at 625.

Finally, in *Hymowitz v. Eli Lilly & Co.*, the Court of Appeals addressed the constitutionality of a statute that revived for one year all actions for injuries caused by the drug diethylstilbestrol ("DES"). *See Hymowitz*, 539 N.E.2d 1069, 1072 (N.Y. 1989). Due to the latent nature of DES injuries, many such suits were barred by the applicable statute of limitations, which accrued upon exposure to the toxic substance rather than discovery of the injury. *See id.* at 1072–73. The Court began by reciting the "stringent," "serious injustice" standard articulated in *Gallewski*. *Id.* at 1079. The Court

29

next observed that a "less strict test" had been applied in other cases, and cited the "reasonable[ness]" standard articulated in *Robinson*. *Id.* Though faced with these two differing standards, the Court concluded that the revival statute in question met "the highest standard" and so found no need to "light upon a precise test." *Id.*[8]

Both BPCA and the Attorney General acknowledge these complexities. Nonetheless, the Attorney General asserts that, based on existing decisions, the "New York courts, if made to choose, would evaluate Jimmy Nolan's Law under a reasonableness standard." Intervenor's Br. at 43. BPCA, meanwhile, insists that New

---

[8] To further complicate our analysis, the Legislature has since enacted a new "discovery" rule to account for "the latent effects of exposure to any substance." *See* L.1986, ch. 682, § 2. The rule provides:

> [A] claim or action for personal injury . . . caused by the latent effects of exposure to any substance or combination of substances . . . shall be deemed to have accrued on the date of discovery of the injury by the plaintiff or on the date when through the exercise of reasonable diligence the injury should have been discovered, whichever is earlier.

N.Y. C.P.L.R. 214-c(3). To our knowledge, New York courts have yet to address how this rule might affect the analysis of a claim-revival statute under either *Robinson* or *Gallewski*.

30

York courts have consistently applied the "serious injustice" test. Appellee's Br. at 41. Indeed, the district court below appears to have adopted this more stringent test. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 66 F. Supp. 3d at 473 (describing revival statutes as applicable "only in limited circumstances," where "serious injustice" might otherwise result).

Faced with two differing legal standards, we are unable to determine which standard the New York Court of Appeals would apply. *See Griffin*, 835 F.3d at 293–94. The question is further complicated by the fact that neither party has cited to us, nor have we found, any case in which any New York state court has struck down any statute reviving expired claims. In the absence of any caselaw applying any of the differing verbal formulations to find such a statute unconstitutional, it is difficult to perceive whether the various tests differ in their concrete application, or under what circumstances New York would find a revival statute

31

unconstitutional under any of the proposed tests. We therefore turn next to the issue of whether certification on this question, as well as the preceding question, is appropriate.

**IV.    Certification to the New York Court of Appeals**

Pursuant to Second Circuit Local Rule 27.2, we may certify to the New York Court of Appeals "determinative questions of New York law that are involved in a case pending before us for which no controlling precedent of the Court of Appeals exists." *Osterweil v. Bartlett*, 706 F.3d 139, 142 (2d Cir. 2013) (internal quotation marks and alterations omitted); *see also State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 505 (2d Cir. 2004) (deeming certification appropriate "where state law is not clear and state courts have had little opportunity to interpret it," "where an unsettled question of state law raises important issues of public policy," and "where the question is likely to recur").

Here, BPCA and the Attorney General contend that New York law is sufficiently settled for us to resolve both legal questions. Nonetheless, the parties agree that, should this Court determine otherwise, certification is the appropriate course. For the reasons described below, we believe that the legal questions presented by this case would more appropriately be answered by the New York Court of Appeals.

Before certifying questions to the Court of Appeals, we must first answer three others: (1) "whether the New York Court of Appeals has addressed the issue and, if not, whether the decisions of other New York courts permit us to predict how the Court of Appeals would resolve it"; (2) "whether the question is of importance to the state and may require value judgments and public policy choices"; and (3) "whether the certified question is determinative of a claim before us." *Griffin*, 835 F.3d at 293–94 (internal quotation marks omitted).

In our view, all three factors weigh in favor of certification. First, as described in detail in Parts II and III, *supra*, we believe there is an absence of authoritative guidance concerning both legal questions.

Second, these questions are plainly of great importance to the State. Whether a public benefit corporation such as BPCA is sufficiently independent from the State and may therefore raise a constitutional challenge to State legislation involves competing policy concerns better addressed by the New York Court of Appeals. *See Schoenefeld v. New York*, 748 F.3d 464, 470 (2d Cir. 2014) (asserting that such policy concerns "should not be ceded to a federal court of appeals when it is unnecessary to do so in the first instance"); *see also City of New York*, 655 N.E.2d at 654 (observing "extreme reluctance of courts to intrude in the political relationships between the Legislature, the State[,] and its governmental subdivisions"). Whether the constitutionality of a revival statute should be judged

34

under the "serious injustice standard" or more lenient "reasonableness" standard likewise requires a series of "value judgments and public policy choices." *See Griffin*, 835 F.3d at 294.

Finally, these questions are determinative of the present litigation. If the particularized-inquiry test applies, and if BPCA is judged to be sufficiently independent from the State, then the traditional capacity-to-sue rule will not attach and BPCA will be free to raise its constitutional challenge. However, if the particularized-inquiry test does not apply, or if it applies but BPCA is deemed to be indistinguishable from the State for the purpose of challenging a State statute, then BPCA will be subject to the traditional capacity-to-sue rule and—unless it can prove that it falls within one of the rule's four limited exceptions—BPCA's constitutional challenge will be dismissed. As to the merits of BPCA's due process challenge, the legal standard by which that challenge is to be judged will in all

likelihood dictate the outcome of our analysis of the constitutionality of Jimmy Nolan's Law.

In light of these considerations, we certify the following questions to the New York Court of Appeals pursuant to Second Circuit Local Rule 27.2 and New York Court of Appeals Rule 500.27:

(1) Before New York State's capacity-to-sue doctrine may be applied to determine whether a State-created public benefit corporation has the capacity to challenge a State statute, must it first be determined whether the public benefit corporation "should be treated like the State," *see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 192 (N.Y. 1987), based on a "particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it," *see John Grace & Co. v. State Univ. Constr. Fund*, 375 N.E.2d 377, 379 (N.Y. 1978), and if so, what considerations are relevant to that inquiry?; and

(2) Does the "serious injustice" standard articulated in *Gallewski v. H. Hentz & Co.*, 93 N.E.2d 620 (N.Y. 1950), or the less stringent "reasonableness" standard articulated in *Robinson v. Robins Dry Dock & Repair Co.*, 144 N.E. 579 (N.Y. 1924), govern the merits of a due process challenge under the New York State Constitution to a claim-revival statute?

36

In certifying these questions, we do not bind the Court of Appeals to the particular questions stated. Rather, the Court of Appeals may expand these certified inquiries to address any further question of New York law as might be relevant to the particular circumstances presented in this appeal. In particular, if the Court of Appeals decides that a particularized inquiry is required with respect to the capacity to sue issue, we would welcome specific guidance, should the Court wish to provide it, as to the appropriate result of the inquiry in this particular case. This panel retains jurisdiction and will consider any issues that remain on appeal once the New York Court of Appeals has either provided us with its guidance or declined certification.

**CONCLUSION**

It is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals this opinion as our certificate, together with a complete set of the briefs and the record

37

filed in this Court. The parties shall bear equally any fees and costs that may be imposed by the New York Court of Appeals in connection with this certification.